Anthony J. Viola
Andre K. Cizmarik
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Plaintiff Sherman Gottlieb
750 Lexington Ave.
New York, NY 10022
(212) 308-4411

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------- X

SHERMAN GOTTLIEB,                           04-CV-4202 (ILG) (VVP)

              Plaintiff,

  -against-

CARNIVAL CORPORATION,

             Defendant.
----------------------------------- X

## PLAINTIFF SHERMAN GOTTLIEB'S PRETRIAL MEMORANDUM OF LAW

### 1.    Summary of the Facts of the Case

Plaintiff Sherman Gottlieb is a retired New York City public school teacher who worked as a travel agent from his home in Staten Island. Mr. Gottlieb was the sole owner and operator of SMG Travel. In connection with that line of work, he utilized a fax machine.

Defendant, Carnival Corporation, is a global cruise company that is organized pursuant to the laws of Panama and maintains its principle place of business in Miami, Florida. Carnival solicits vacationers from all over the world to book trips on its fleet of cruise ships, often by way of travel agencies.

In March of 1999, Carnival apparently created an agency profile on its internal computer database for Mr. Gottlieb. However, at no point during 1999 or before did Mr. Gottlieb offer

Carnival Cruises to his clients. Moreover, there is no written agreement between the parties whereby Mr. Gottlieb registered to become a travel agent of Carnival in 1999 or before or after, and Mr. Gottlieb does not remember either registering to become Carnival's agent or providing Carnival his fax number. Further, Carnival has <u>no</u> contemporaneous documents or other evidence concerning Mr. Gottlieb's supposed "registration" in 1999. Additionally, Carnival has <u>no</u> contemporaneous documents or other evidence which shows that Mr. Gottlieb provided his fax number to Carnival in 1999 or before. In 1999 and continuing thereafter, Carnival did not seek permission before faxing promotional materials to any agent and did not cease transmitting them until an agent voiced his objection. Finally, Carnival's agency profile indicated that Mr. Gottlieb did not transact any business with Carnival from March 1999 until February 2004.

Beginning in or about 2000, Mr. Gottlieb began receiving fax advertisements – often referred to as junk faxes – from Carnival that provided information on its cruises and rates. Between 2000 and 2004, Mr. Gottlieb received hundreds of fax advertisements from Carnival. The parties have stipulated that between September 28, 2000 and April 20, 2003, Carnival sent 750 faxes to Mr. Gottlieb. Unless Carnival can establish its affirmative defenses, it is liable under the TCPA for each of those 750 faxes. In addition, the parties also agree that (of those 750 faxes) 225 were sent at dates and times which violate the requirements of N.Y. GBL §396-aa. Unless Carnival can establish its affirmative defenses, it is separately liable under the NY statute for each of those 225 faxes. At no point in time did Mr. Gottlieb ever authorize Carnival orally or in writing to send him promotional or junk faxes. Indeed, there is no evidence in the record to suggest that Mr. Gottlieb ever expressly invited or permitted Carnival to fax these materials to him.

On several occasions in late 2000 and early 2001, Mr. Gottlieb contacted Carnival and

spoke to their representatives on the telephone and informed them that he did not wish to receive promotional faxes and that his fax number should be removed from Carnival's fax list. At or about the same time, Mr. Gottlieb also sent written requests to Carnival to cease sending him promotional faxes. These written requests were either in the form of a letter to Carnival asking it to stop faxing him or Mr. Gottlieb would simply take an unsolicited fax, write "DO NOT FAX" (or words to that effect) on it and fax it back to Carnival.

Mr. Gottlieb eventually came to learn that Congress had enacted a law – the Telephone Consumer Protection Act of 1991 – which addressed the evils of junk faxes.

In late 2002, Mr. Gottlieb sought legal advice from Louis Mauriello (an attorney whom Mr. Gottlieb had used in the past) about commencing actions under the TCPA against various junk fax offenders.

In January 2003, Mr. Gottlieb gave Mr. Mauriello his original file of unsolicited faxes which included hundreds of faxes that Mr. Gottlieb received from Carnival between 2000 and 2003. Mr. Gottlieb assumed that Mr. Mauriello would safeguard this file and thus Mr. Gottlieb did not keep copies of those faxes. Together with those faxes, Mr. Gottlieb also provided Mr. Mauriello several letters and faxes that Mr. Gottlieb sent to Carnival requesting that it cease sending him unsolicited faxes. While Mr. Mauriello does not recall whether he received Mr. Gottlieb's faxes during the January 2003 meeting or thereafter, Mr. Mauriello admits that Mr. Gottlieb did hand him a file which included faxes that Mr. Gottlieb had received from various companies. Mr. Mauriello recalls reviewing the file at a later time in his office, but does not recall what faxes or letters were in the file. Mr. Mauriello cannot dispute that among the papers given to him by Mr. Gottlieb were letters and/or faxes from Mr. Gottlieb to Carnival requesting that it cease faxing him. Subsequent to the January 2003 meeting, approximately five months

elapsed and Mr. Gottlieb had not heard anything from Mr. Mauriello, despite several telephone calls by Mr. Gottlieb.

Mr. Gottlieb was finally able to reach Mr. Mauriello by telephone in June 2003. Mr. Mauriello admits that, during the call, he assured Mr. Gottlieb that he was handling the matter; that he intended to send letters to the fax violators; and that if the fax violators refused to settle, Mr. Mauriello intended to file lawsuits. This never happened, however, because, as Mr. Mauriello admits, he negligently lost Mr. Gottlieb's entire file.

Mr. Mauriello admitted that once he realized that Mr. Gottlieb's file had been lost, he began "ducking" Mr. Gottlieb's telephone calls. Eventually, Mr. Gottlieb filed a complaint with the Richmond County Bar Association. In response, Mr. Mauriello admitted that he had lost Mr. Gottlieb's file.

Prior to 2004, Mr. Gottlieb only booked one Carnival cruise, except he did not book that cruise directly with Carnival. Instead, he booked the cruise through Cruise Value Center, which is a cruise consolidator. Cruise consolidators purchase large blocks of cabins at a discount from cruise operators (such as Carnival) and then re-sell them to travel agents and to members of the public. Any commission that Mr. Gottlieb earned from that cruise was paid by Cruise Value Center, not by Carnival. Further, in connection with that cruise, Mr. Gottlieb did not have any communications directly with Carnival concerning booking that reservation.

The only cruise that Mr. Gottlieb ever booked directly with Carnival was in February 2004, which was the first time that Mr. Gottlieb contacted Carnival for the purpose of booking a cruise for one of his customers. However, by February 5, 2004, Carnival designated Mr. Gottlieb as an "inactive" agent and required him to reactivate his status as an agent by entering into an agency agreement. The February 5, 2004 agency agreement made no reference to Mr.

Gottlieb's preference regarding promotional materials, and nothing on the form he submitted to Carnival indicated that he was inviting or permitting the transmission of promotional faxes. In any event, the unsolicited faxes at issue all pre-date February 2004. Moreover, within days of making that reservation, that cruise was cancelled because his client ultimately opted not to go on the cruise. He was required to, and did, return the commission payment.

Carnival's records do not show that it did any business with Mr. Gottlieb from 1999 to 2004 other than faxing him confirmations in March of 2000 and in February and April of 2002, all of which corresponded to various bookings that SMG Travel made through Cruise Value Center, and which do not reflect any transactions directly with Carnival.

From 1999 to 2007, Mr. Gottlieb never actually earned and retained any money from Carnival. Carnival has no documents which show that Mr. Gottlieb earned any profits or commissions from Carnival from 1999 through 2007. As such, from 1999 to 2007, Mr. Gottlieb never profited from any transaction with Carnival.

2. **Summary of the Evidence, or lack of evidence, supporting the position of the briefing party.**

The evidence supporting the position of plaintiff Sherman Gottlieb consists of anticipated testimony of Mr. Gottlieb as well as his former attorney, Louis Mauriello, as summarized above.

In addition, it is anticipated that Carnival lacks evidence of, and will be unable to prove, its alleged affirmative defense of an "established business relationship" with plaintiff as per the Telephone Consumer Protection Act and its affirmative defense of a "prior contractual or business relationship" with plaintiff as per N.Y. Gen. Bus. Law § 396-aa as Carnival has no competent witness to testify concerning the alleged inception of any purported business relationship and Carnival lacks any documentary evidence to show that Mr. Gottlieb and

Carnival transacted any business during the time when Carnival sent the offending faxes.

**3. Significant issues of law with authorities deemed to be controlling, that will have to be determined before or during trial.**

The "court," meaning either the judge or the jury, can increase damages from $500 per fax up to $1500 per fax if it finds that the defendant willfully <u>or</u> knowingly violated the TCPA. 47 U.S.C. § 227(b)(3) (emphasis added); Irvine v. Akron Beacon Journal, 770 N.E.2d 1105, 1119-20 (Ohio Ct. App. 2002) ("the term 'court' [in 47 U.S.C. § 227(b)(3)] might reasonably be . . . construed to include the judge and jury"). The idea that "court" can mean "jury" is supported by Supreme Court precedent. Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 356 (1998) (the word "court" has a "broader legal meaning, which includes both judge and jury") (Scalia, J., concurring). This is the logical interpretation of "court" under 47 U.S.C. § 227(b)(3) because here, the jury is adequately equipped to make the determination of whether or not a plaintiff is entitled to damages under the TCPA. Irvine, 770 N.E.2d at 1120 (whether the defendant's violation is willful or knowing "requires a mere factual finding"). In any event, even if Mr. Gottlieb does not have a statutory right to a jury determination on treble damages, he might have a constitutional right. Id.; see, e.g., 523 U.S. at 355 (holding that "the Seventh Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages under . . . the Copyright Act, including the amount itself"). Thus, it is well within the province of the jury to determine whether defendant willfully or knowingly violated the TCPA, and if so, whether Mr. Gottlieb is entitled to treble damages.

## I. A "WILLFUL" OR "KNOWING" VIOLATION OF THE TCPA DOES NOT REQUIRE A DEFENDANT'S AWARENESS OF THE STATUTE ITSELF

The statutory penalty of $500 per fax may be increased by up to $1500 per fax if the trier of fact concludes that the defendant either "knowingly" or "willfully" violated the TCPA. 47 U.S.C. 227(b)(3). Neither a finding of "willful" nor "knowing" require that a defendant be aware that it is violating the statute. Rather, defendant need only be conscious that it is committing the acts that constitute a violation of the TCPA. This interpretation of the willful and knowing standard is borne out in both the text of the 1934 Communications Act – of which the TCPA is a part – and case law.

An amendment to the Communications Act, 47 U.S.C. 312(f)(1), defines "willful" as "the conscious and deliberate commission or omission of [an] act, irrespective of any intent to violate any provision of this chapter." Section 312(f)(1) is part of the same chapter – Chapter Five – as the TCPA, and therefore, its definition of "willful" applies. The application of Section 312(f)(1) in the TCPA context is supported by jurisprudence. Zeid v. The Image Connection, Ltd., No. 01AC-002885 (Mo. Cir. 2001) (affirming that, with regards to the TCPA, "[t]he proper construction of 'willful' within the context of the 1934 Communication's act [sic] is set forth at 47 U.S.C. § 312(f), and reiterated in [In re Southern California Broadcasting Co., 6 F.C.C.R. 4387 (1991)]."); see also In re Valley Page, 12 F.C.C.R. 3087, 3088 (1997) (applying the Section 312 definition of "willfully" to Section 503(b) of the 1934 Communications Act); In re Dynasty Mortgage, L.L.C., 22 F.C.C.R. 9453, 9470 n.86 (2007) (applying Section 312 definition of "willfully" to FCC Rule § 64.1200(c)(2)). Thus, 47 U.S.C. § 312(f)(1) dictates the definition of the "willfully" appearing in the TCPA.

Case law further supports the proposition that a "willful" violation of the TCPA does not require that a defendant be cognizant of the statute. Charvat v. Ryan, 879 N.E.2d 765 (Ohio

2007) addressed this issue squarely, holding that "to establish a willful violation of the TCPA for an award of treble damages, a plaintiff must prove that the defendant consciously and deliberately committed or omitted an act that violated the statute, irrespective of any intent to violate the law." Id. at 771. Likewise, in Covington & Burling v. International Marketing & Research, No. Civ.A. 01-0004360, 2003 WL 21384825 (D.C. Super. 2003), the court held that a defendant's violations of the TCPA were willful because, inter alia, it had "not presented evidence that the faxes to [plaintiff] were sent in error" and because defendant "continued to send faxes to [plaintiff] even after [it] was asked to stop." Id. at *8. A plaintiff, then, need not show that a defendant was aware of TCPA in order to demonstrate a willful violation of that statute.

Case law is similarly clear on the definition of "knowingly" under the TCPA. Charvat instructs:

> For an award of treble damages under the TCPA, the term 'knowingly' requires that liability be imposed even without [defendant's] knowledge that the conduct violated the statute. To establish a 'knowing' violation of the TCPA for an award of treble damages, a plaintiff must prove only that the defendant knew of the facts that constituted the offense. Such knowledge of the 'facts that constitute the offense' does not mean that certain conduct actually violates a law because it 'constitutes an offense.' We hold that to establish a knowing violation of the TCPA for an award of treble damages, a plaintiff must prove only that the defendant knew that it acted or failed to act in a manner that violated the statute, not that the defendant knew that the conduct itself constituted a violation of law.

879 N.E.2d at 770. See also Zeid, No. 01AC-002885 (under the TCPA "'knowingly' cannot be held to mean knowledge that a particular act was a violation of the law, as this would conflict with the truism that all persons are presumed to know the law"). These cases make plain that the "knowingly" standard of the TCPA, like the "willfully" standard, does not require that defendant be aware that it is violating the statue.

-8-

Dated: New York, New York
March 1, 2010

Respectfully Submitted,

EDWARDS ANGELL PALMER & DODGE LLP

*[signature: Andre K. Cizmarik]*

Anthony J. Viola
Andre K. Cizmarik
Attorneys for Plaintiff Sherman Gottlieb
750 Lexington Avenue
New York, NY 10022
(212) 308-4411

NYC 343272.1